Filed 9/30/15  P. v. Sherard CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B254424 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA406684) |
| v. | |
| LAWRENCE SHERARD et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  Ronald H. Rose, Judge.  Affirmed.

Buckley & Buckley and Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant Lawrence Sherard.

Maria Leftwich, under appointment by the Court of Appeal, for Defendant and Appellant Darryl Ray Mills.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Darryl Ray Mills (Mills) and Lawrence Sherard (Sherard) (collectively defendants) appeal from judgments entered after multiple felony convictions. Mills challenges the joinder of counts 5 and 8 with count 1 for trial, and also contends: that the trial court abused its discretion in excluding the testimony of the robbery victim alleged in a dismissed count; that the trial court erred in refusing to give a requested instruction on theft as a lesser included offense of robbery; that the trial court violated his constitutional right to represent himself during sentencing; and that cumulative error requires reversal. Sherard contends that his conviction of attempting to dissuade a witness was unsupported by substantial evidence, and that count 1 must be reversed because the victim's 911 call was inadmissible hearsay that should have been excluded in its entirety. We find no merit to defendants' contentions, and affirm the judgments.

## BACKGROUND

In an amended information, defendants were jointly charged in count 1 with the second degree robbery of Edwin Hernandez (Hernandez)[1] in violation of Penal Code section 211.[2] Mills alone was charged in counts 2, 3, 5, and 8, as follows: carrying a loaded unregistered handgun in violation of section 25850, subdivision (a) (count 2); possession of a firearm by a felon in violation of section 29800, subdivision (a)(1) (count 3); the second degree robberies of Karina Lo (Karina)[3] and of Elizabeth Bacher

---

[1] Count 1 alleged that the victim of the robbery was Edwin Hernandez, but he testified that his name was Edin Hernandez.

[2] All further statutory references are to the Penal Code, unless otherwise indicated.

[3] As Karina Lo and her sister Cassandra Lo both testified at trial, we refer to the sisters by their first names to avoid confusion and not out of a lack of respect.

(Bacher), in violation of section 211 (counts 5 and 8). In count 13, Sherard was charged with attempting to dissuade a witness, in violation of section 136.1, subdivision (a)(2).[4]

In addition, the amended information alleged that the robbery charged in count 1 was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C). It was further alleged that Mills had suffered three prior convictions within the meaning of section 667.5, subdivision (b), and that Sherard had suffered one prior conviction within the meaning of the "Three Strikes" law (§§ 1170.12, subd. (b), 667, subd. (b)-(j)) and within the meaning of section 667, subdivision (a)(1) as well as three prior convictions within the meaning of section 667.5, subdivision (b).

A jury found both defendants guilty of count 1 as charged, and found true the gang allegation. Mills was found guilty of counts 2, 3, 5, and 8, as charged, and Sherard was found guilty of count 13 as charged. In a bifurcated court trial the court found true two of the prior convictions alleged as to Mills for purposes of section 667.5, subdivision (b). With regard to Sherard, the court found true the three prior convictions as alleged.

On February 14, 2014, the trial court sentenced Sherard to a total term of 12 years four months in prison, and sentenced Mills to a total prison term of 17 years. Sherard's sentence was comprised of the middle term of three years as to count 1, doubled to six years as a second strike, plus five years pursuant to section 667, subdivision (a), and as to count 13, a consecutive one-third middle term doubled to 16 months as a second strike. The trial court imposed and stayed two one-year enhancements under section 667.5, subdivision (b), as well as the 10-year gang enhancement under section 186.22, subdivision (b)(1)(C). The trial court sentenced Mills to the middle term of three years as to count 1, plus a gang enhancement of 10 years, and two one-year prison prior enhancements. The court imposed a concurrent three-year term as to count 2, the high term of three years as to count 3, which the court stayed pursuant to section 654, and a consecutive one-year term as to each of counts 5, and 8, representing one-third the middle

---

[4]     In counts 7, 9, 10, 11, and 12, Mills was charged with second degree robbery, identity theft, and second degree commercial burglary. These counts were dismissed before trial.

term of three years. Both defendants were ordered to pay mandatory fines and fees, and Sherard received 451 days of presentence custody credits, while Mills received 437 days.

Defendants filed timely notices of appeal.

**Prosecution evidence**

*Hernandez robbery*

On January 2, 2013, around 7:30 p.m., Hernandez went to a liquor store near his home. While he was paying for his purchase a man he later identified as Mills, approached and asked where Hernandez was from. Hernandez understood Mills to be asking what gang he belonged to, and replied "I don't gangbang." Hernandez was frightened of gangs and felt threatened and intimidated by Mills's question. As he walked outside the store Hernandez encountered Mills with another a man, whom Hernandez later identified as Sherard. Hernandez thought Sherard said "West Side" and something else as he pushed Hernandez and then punched him in the face and back, hurting his back and causing his cheek to swell. Hernandez thought they were trying to kill him "or something." Mills then went behind Hernandez and demanded Hernandez's cell phone and wallet as Sherard stood facing Hernandez. There was something under Mills's shirt that Hernandez thought was a gun. Hernandez saw Mills place his hand under his shirt in that area. Once Hernandez handed over his wallet, Sherard told him to "get the fuck out of here," and walked away. Mills remained next to Hernandez and searched through his pockets. Hernandez offered the liquor he had just bought, but Mills did not take it. From the time of the first punch to the pocket search, the incident lasted about 10 seconds. Mills then walked away and Hernandez walked home.

Hernandez called 911 after a friend arrived and persuaded him to call the police about 1:30 a.m. The 911 call was played for the jury. Hernandez gave the 911 operator descriptions of the assailants and said that there had been a third man and a woman with them, in a van.

The liquor store surveillance video was also played for the jury. Hernandez identified images of Sherard and Mills greeting each other while Hernandez was inside; of Sherard inside the store and outside the front door a few minutes later; and of himself

4

and Mills at the register when Mills asked where he was from. The video showed Hernandez leaving the store and Mills approaching him. While the blows were not captured on camera, Hernandez could be seen backing up after having been punched.

### Sherard's courtroom gestures

Hernandez testified about an incident which took place at the preliminary hearing several months before trial. After Hernandez had taken the witness stand and before the first question, Sherard "threatened [him] like doing signals with the punch." Hernandez demonstrated by making a fist with his right hand and raising it upward over his chest with his elbow bent; he then opened his fist enough to point his index finger forward, and closed it back again into a fist, which he moved back and forth a number of times. As he made the gestures, Sherard looked at Hernandez and mouthed something. It appeared to Hernandez that Sherard was mouthing, "I'm gonna fuck you up," but the words were not audible. Hernandez felt threatened and frightened, and did not say anything until he spoke to a detective after giving his testimony; however, he took the witness stand again during the preliminary hearing, and testified about Sherard's actions.

The parties later stipulated that Deputy Sheriff Jason Jones, the bailiff at the preliminary hearing, was deemed to have testified under oath that Sherard was handcuffed to his chair by one hand, with the other hand free; that he did not see Sherard make any gestures toward Hernandez; that he was seated behind Sherard at the bailiff's desk; and that the courtroom layout was identical to the trial courtroom.

### Gang evidence

Los Angeles Police Department (LAPD) Officer Ian O'Brien testified as the prosecution's gang expert. His primary assignment focused on the School Yard Crip gang, the largest and most active gang in his division. The gang's primary activities were robbery, burglary, assault with a deadly weapon, weapons violations, and attempted murder. Officer O'Brien presented certified conviction records of two of its members to show that the School Yard Crip gang was a criminal street gang. He explained that gang members elevated their status within the gang and demonstrated their loyalty to the gang by committing crimes, known as "putting in work" for the gang.

5

Officer O'Brien had become acquainted with some of the School Yard Crip members through consensual contact, traffic or pedestrian stops, and arrests. He was familiar with the gang's common signs and symbols which were usually seen in tagging, graffiti, and tattoos. Such markings were used by the gang to identify and claim the neighborhood as the gang's territory, and to intimidate residents in order to maintain an area where the gang could commit crimes without fear of being reported. The liquor store where Hernandez was robbed was located within the territory of the School Yard Crip gang.

Both defendants were members of the School Yard Crip gang. Officer O'Brien had multiple contacts with Mills during which Mills had admitted his membership in the gang. Officer O'Brien had also seen him openly associating with other School Yard Crip gang members. A photograph of Mills was shown to the jury, as Officer O'Brien explained the meaning of each tattoo. Mills's known gang monikers were "Snowflake" and "B.K. Blue" which stood for Blood Killer, and the gang's color, blue. Sherard, who had admitted being an active member of the gang to other officers, also had gang-related tattoos: "S.Y" on his forehead; and "Midtown" on his chin, representing the gang's territory. Sherard's moniker was Porky or Baby Porky.

In response to a hypothetical question based upon the facts in evidence regarding the Hernandez robbery, Officer O'Brien gave his opinion that the crime was committed for the benefit or at the direction of a criminal street gang, and in association with the gang. He explained that the School Yard Crip gang benefitted from such criminal activity, as it served to maintain the intimidation and fear in the community, and provided a steady cash flow to help fellow gang members in prison, to post bail, to purchase firearms, narcotics, and to pay the other costs of the gang lifestyle.

### Lo robbery

On January 20, 2013, between 7:00 and 7:30 p.m., Karina and her sister Cassandra were walking to their car in a very dark area of 8th Street and La Brea Avenue in Los Angeles, after having left a restaurant. A man in a hoodie approached them, placed his arm around Karina's throat, and then struggled with her over the purse that she held

by its handle. An object that felt like a gun touched Karina as the man ordered her to release the purse. Fearing for herself and her sister, Karina let go of the purse. The man ran off with the purse and Cassandra called the police. Karina later identified Mills as the robber in a six-pack photographic lineup, and identified him at trial as the same man. She had described him as having "strong" eyebrows and light skin.

Cassandra testified that she saw the man grab her sister in a headlock and hold something against her, as he told her to let go of her purse or he was "gonna pop" her. Cassandra was unable identify the man at trial, but recalled identifying Mills at the preliminary hearing and testifying that he resembled the man. Cassandra's 911 call was played for the jury. She described the man as Hispanic or white with blond hair,[5] and told the 911 operator that he had threatened her sister with a knife.

### *Bacher Robbery*

Later in the same evening as the Lo robbery, Bacher was walking home along Santa Monica Boulevard in West Hollywood, carrying groceries, when she noticed that a man was following about 10 paces behind. After she stopped to let the man pass, she walked behind him until she reached a 7-Eleven store, which she entered. After buying water, Bacher continued on to Curson Avenue, where she turned and saw the man again. Although he wore a hood, she saw his face and later identified him as Mills. Bacher saw two shadows just before Mills grabbed her from behind. Mills then placed her in a bear hug and pushed her down to the pavement. As she struggled, he grabbed her hair, got on top of her, and hit her head onto the driveway. Worried that he might be armed, she handed him her purse which he took and then ran away. One week later Bacher selected a photograph of Mills from a six photograph display, and identified him as her assailant. Four or five months later she identified Mills in a live lineup.

### *The arrest of Mills*

On the evening of January 31, 2013, LAPD Officer Nicholas Gallego was in his patrol car with Officer Horta, when he recognized Mills, who was on foot. Officer Horta

---

**5** Evidence of Mills's hair color at the time of his arrest was not presented at trial.

ran a check and determined that Mills had an outstanding arrest warrant, so he got out of the patrol car and loudly asked Mills to stop. Mills shook his head, said no, and ran east on Exposition Boulevard, then north on Western Avenue. As both officers gave chase on foot, Mills reached into his right front waistband, drew out a firearm which he threw to the ground. Officer Gallego picked it up as he passed. Mills continued to run as both officers ordered him several times to stop. Finally, Mills surrendered after entering an alley. Officer Gallego testified that the gun was a loaded .22-caliber semiautomatic and appeared to be in working order.

**Defense evidence**

Psychologist Mitchell Eisen testified as the defense expert on eyewitness memory and suggestibility. He testified that a traumatic event can interfere with memory, and explained some other factors that affect memory, such as people's tendency to fill memory gaps with inferences, sometimes accurately and sometimes inaccurately. Dr. Eisen explained why reports given immediately after an event tend to be more detailed and more accurate than later reports; how details of the event might be lost; how memories might decline dramatically during the hours or days after the event before reaching a plateau; and how over time, "post-event information" might affect a memory, especially if the witness perceived the source of the information as credible.

Dr. Eisen explained that under the guidelines of the United States Department of Justice, a photographic lineup including a suspect was required to include five "filler" photographs that matched the suspect's general description. If the filler photographs were an inadequate match, the suspect would be highlighted as the only viable choice, and this "six-pack" photographic lineup would be considered suggestive. With a fair six-pack, some witnesses might have an immediate and powerful recognition, while others might use "relative judgment" and simply choose the one with the most similar features. Research had shown that a suggestive six-pack might result in the identification of the same incorrect person by several witnesses. Sometimes photographic lineups were unfair because the witness might expect or might have been influenced to believe that it included the perpetrator's photograph. Sometimes in court or during a live lineup,

8

witnesses have identified the same person whose photograph was previously selected, merely because the face had become familiar, not necessarily because the witness's memory was accurate.

Dr. Eisen testified that research had also shown that confidence in an identification was not a good indicator of accuracy, as witnesses were sometimes 100 percent certain in their mistaken identifications. Further, their confidence in an identification might have been bolstered by such factors as knowing that other witnesses identified the same person, that law enforcement believed that the right person was identified, or other evidence supporting the original selection.

The defense also called Deputy Sheriff Manuel Barraza, who responded to the Bacher robbery. He had spoken with Bacher, who described the assailant as a white male, possibly 5'11" and weighing around 180 pounds.

Officer Jose Vizcarra testified that he responded to the call regarding Hernandez. Hernandez described one suspect as an African-American male, approximately 25 years old, 5'11," 150 pounds, with a tattoo on his face; and a second suspect as African-American male, also approximately 25 years old, 5'7," 240 pounds, wearing a black jacket, black pants, and a baseball hat. Hernandez reported that the first suspect asked him where he was from, punched him, asked for his phone and money, told him to "get the fuck" out of there, and then joined the second suspect and the two others where they waited near a vehicle. Hernandez did not say that he was punched more than once and did not report any injuries.

The defense also called LAPD Officer Julian Robinson, who testified that he spoke to Karina at the robbery scene for 10 to 15 minutes, and then filed an incident report. He reported that Karina described a white male with brown hair, 5'10" tall, weighing 160 pounds, 20 to 30 years old, and wearing a black hooded sweatshirt and black pants. Officer Robinson wrote "white" in the section on his report for specifying race or skin tone, but he could not recall whether Karina had referred to him as a white male or whether she had simply said that his skin was white.

The mother of Mills's child, Alexys Watson, testified that she was with Mills on January 2, 2013, at approximately 7:30 p.m., when they stopped at the liquor store for a snack. Watson parked her van in front of the store and waited there with her five children while Mills went inside. As Mills was entering the store he greeted some people standing in front, he then bought his snack and returned to the van. Watson did not see anyone get robbed and did not see Mills hit or rob anyone. Watson was not certain of the date. It could have been January 3.

## DISCUSSION

### I. Joinder of counts 5 and 8

#### A. *Prosecution motion to consolidate*

Mills contends that the trial court abused its discretion in consolidating the Lo and Bacher robberies (counts 5 and 8) with the Hernandez robbery (count 1). The order was made prior to the preliminary hearing, pursuant to the prosecution's written motion to consolidate Mills's four separate cases into the case in which both defendants were charged with the Hernandez robbery. Before jury selection, counsel for Mills orally moved to sever counts 5 and 8 from count 1 for trial. The trial court denied the motion.

Section 954 permits the joinder of "two or more different offenses connected together in their commission, or . . . two or more different offenses of the same class of crimes or offenses, under separate counts." (§ 954.) The trial court granted the prosecution's motion to consolidate the counts upon finding that the three counts alleged the same class of crime. Violations of the same penal code provision are of the same class. (*People v. Soper* (2009) 45 Cal.4th 759, 771.)

Thus as counts 1, 5, and 8 all alleged second degree robbery in violation of section 211, granting the motion to consolidate was proper. It became incumbent upon Mills, as the party opposing the motion to consolidate and later as the party moving to sever, to make a clear showing of potential prejudice if the crimes were tried together. (*People v. Ochoa* (1998) 19 Cal.4th 353, 409.) "'Because consolidation ordinarily promotes efficiency, the law prefers it.' [Citations.] Accordingly, if . . . joinder is proper under section 954 . . . , it is the defendant's burden to show error in allowing a joint trial of the

10

charged offenses and relief will obtain only on a clear showing of prejudice to establish the trial court's abuse of discretion.  [Citation.]"  (*People v. Lucas* (2014) 60 Cal.4th 153, 214.)  To establish that the denial of a motion to sever properly joined counts amounted to a prejudicial abuse of discretion, the defendant must demonstrate that the court's ruling exceeded the bounds of reason.  (*People v. Capistrano* (2014) 59 Cal.4th 830, 848.)

Four criteria used to determine whether the burden has been met "are these:  (1) would the evidence of the crimes be cross-admissible in separate trials; (2) are some of the charges unusually likely to inflame the jury against the defendant; (3) has a weak case been joined with a strong case or another weak case so that the total evidence on the joined charges may alter the outcome of some or all of the charged offenses; and (4) is any one of the charges a death penalty offense, or does joinder of the charges convert the matter into a capital case.  [Citation.]"  (*People v. Marshall* (1997) 15 Cal.4th 1, 27-28.)

Based upon the evidence presented at trial Mills contends that the first three factors apply here.  The trial court's discretion must be reviewed on the basis of the information before the court *at the time of its ruling* on a motion for separate trials.  (*People v. Soper, supra*, 45 Cal.4th at p. 774.)  Before the court in this case were the motion, opposition, and oral argument.

The consolidation motion contained a brief summary of each robbery showing that all three robberies were quick strong-arm robberies of strangers on the street, committed within a short period of time (during the month of January 2013); and the prosecutor represented that the facts would be cross-admissible to show modus operandi and identity.  With regard to the first factor, the court found that evidence would be cross-admissible in separate trials.  We agree that at that stage of the proceedings the facts suggested a common plan and demonstrated potential cross-admissibility.  (See *People v. Capistrano, supra*, 59 Cal.4th at p. 849.)  This "'factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.'  [Citations.]"  (*People v. Merriman* (2014) 60 Cal.4th 1, 38.)

The opposition to the motion detailed the flaws in the witnesses' identifications in all robbery counts except count 1, and defense counsel argued that that count 1's stronger

11

identification evidence could influence the other counts with weaker identification evidence. Counsel also argued that inflammatory gang evidence could influence the counts in which no gang enhancement was alleged. The court found that such defense arguments were speculative, as there had not yet been a preliminary hearing, and that Mills had not otherwise demonstrated potential prejudice requiring separate trials. The court suggested that any prejudice could be remedied with a motion to bifurcate and a request for a limiting instruction once the case was assigned to a trial department. The defense made no request for a limiting instruction.[6]

### B. Defense motion to sever

On the first day of trial, counsel for Mills made an oral motion to sever counts 5 and 8 from count 1 for trial. As the party seeking severance, his burden was "to clearly establish . . . a substantial danger of prejudice requiring that the charges be separately tried." (*People v. Bean* (1988) 46 Cal.3d 919, 938.) In denying the motion to sever, the trial court found that defense counsel's showing was inadequate, consisting merely of the same speculative arguments made in opposition to the motion to consolidate. We find that the motion to sever was unsupported by reference to the preliminary hearing testimony or other evidence. Mills thus did not meet his burden, and we find no abuse of discretion.

### C. No prejudice

As the trial court did not abuse its discretion, Mills is not entitled to reversal unless he "'shows that joinder actually resulted in "gross unfairness" amounting to a denial of due process.' [Citation.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 162.) To do so Mills must demonstrate that the joinder resulted "in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.' [Citation.]" (*United States v. Lane* (1986) 474 U.S. 438, 449.) In other words, he must

---

[6] At trial, Sherard's counsel made a perfunctory oral motion to bifurcate the gang allegation. Counsel for Mills joined, but submitted the motion without argument. In his opening brief, Sherard assigned error to the trial court's denial of the motion, but withdrew this contention in his reply brief.

demonstrate a reasonable probability that the joinder influenced the jury's guilty verdicts. (*People v. Bean, supra*, 46 Cal.3d at p. 940.)

Mills contends that the trial of counts 5 and 8 was rendered grossly unfair by the admission of gang evidence, as it was unrelated to any issue in those robberies. He argues that because the identification evidence in counts 5 and 8 was weak, it is likely that the jury convicted him solely because he was a member of a violent gang that generated fear in the community. Because inflammatory gang evidence has the potential to cause the jury to convict regardless of the defendant's actual guilt, it should not be admitted if its probative value is minimal. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1050-1051.)

The gang evidence was admissible and necessary prove the gang enhancement in count 1. To the extent that it was not relevant or admissible as to counts 5 and 8, the trial court would have been required to give a limiting instruction on request, restricting the evidence to its proper scope. (*People v. Hernandez, supra*, 33 Cal.4th at p. 1051; Evid. Code, § 355.) As jurors are presumed to understand, accept, and faithfully follow instructions, any prejudice from the gang evidence would have been dispelled by the appropriate limiting instructions. (See *People v. Homick* (2012) 55 Cal.4th 816, 866-867.) As the trial court had no sua sponte duty to give a limiting instruction, and Mills did not request one, he may not now complain of any prejudice caused by its omission. (See *People v. Chism* (2014) 58 Cal.4th 1266, 1292.)

In any event, we agree with respondent that Mills has not shown prejudice. We apply the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), under which Mills must show that he would have received a more favorable result in a separate trial. (See *People v. Mackey* (2015) 233 Cal.App.4th 32, 100.) There is no merit to Mills's contention that the identification evidence admitted in support of counts 5 and 8 was weak. The Lo and Bacher robberies were committed on the same evening by a man of similar height and build and who appeared to be white. Karina and Cassandra both identified Mills as the perpetrator of the Lo robbery. Karina selected his photograph from in a photographic lineup, and then identified him at trial as the same man.

Cassandra identified Mills at the preliminary hearing as resembling the robber. Bacher identified Mills both from his photograph and in a live lineup. We conclude that even if the jury had not heard the gang evidence in a separate trial of counts 5 and 8, there is no reasonable probability that Mills would have received a more favorable result on those counts.

## II. Third-party culpability

Mills contends that the trial court abused its discretion in excluding the testimony of Irina Klioutchevskaia, the alleged robbery victim in count 7, which was originally consolidated with the other robbery counts, but then dismissed before trial on the prosecutor's motion. Mills contends that Klioutchevskaia's recantation of her identification of Mills and later identification of another person would have been relevant to raise a reasonable doubt about the victims' identification of Mills in the Lo and Bacher robberies. He also contends that the exclusion of the evidence resulted in the denial of his constitutional rights to due process, a fair trial, and to present a defense.

Any relevant evidence that raises a reasonable doubt as to a defendant's guilt is admissible, "including evidence tending to show that a party other than the defendant committed the offense charged. Such evidence may be excluded only when the court properly exercises its discretion under Evidence Code section 352 to reject evidence that creates a substantial danger of undue consumption of time or of prejudicing, confusing, or misleading the jury." (*People v. Hall* (1986) 41 Cal.3d 826, 829, fn. omitted.) "The court's proper inquiry [is] limited to whether this evidence could raise a reasonable doubt as to defendant's guilt and then applying [Evidence Code] section 352." (*People v. Hall*, at p. 833.)

We review the trial court's determination for abuse of discretion. (*People v. Elliott* (2012) 53 Cal.4th 535, 581.) A trial court has broad discretion to evaluate evidence under Evidence Code section 352. (*People v. Robinson* (2005) 37 Cal.4th 592, 625.) The court may exclude evidence whenever its probative value is substantially outweighed by the probability that its admission will require an undue consumption of

14

time or create a substantial danger of confusing the issues. (*People v. Mills* (2010) 48 Cal.4th 158, 195.)

The trial court's discretion under Evidence Code section 352 will not be disturbed unless it was exercised "'in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.) A miscarriage of justice occurs when it appears that a result more favorable to the appealing party would have been reached in the absence of the alleged errors. (*Watson, supra*, 46 Cal.2d at p. 836; see Cal. Const., art. VI, § 13.) "[T]he exclusion of weak and speculative evidence of third party culpability does not infringe on a defendant's constitutional rights." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1261, citing *Holmes v. South Carolina* (2006) 547 U.S. 319, 326-327.) Even an erroneous exercise of discretion to exclude third-party culpability evidence would not implicate the federal constitution; thus the applicable standard of prejudice is that for state law error, as set forth in *Watson*. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.)

"We review the correctness of the trial court's ruling at the time it was made." (*People v. Welch* (1999) 20 Cal.4th 701, 739.) Further, reversal is unwarranted unless "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means." (Evid. Code, § 354, subd. (a).)

Mills made his offer of proof in a written motion in limine, which included a summary of a district attorney investigator's interview with Klioutchevskaia in November 2013, and a statement of facts, which purported to summarize portions of police reports. On appeal, Mills refers not only to the written motion and the evidence presented at trial, but also assertions contained in the prosecutor's motion to consolidate, which was heard prior to the preliminary hearing in another department of the superior

15

court. We do not summarize those facts, as there is no indication that the trial court considered that in connection with the motion to admit Klioutchevskaia's testimony.[7]

Klioutchevskaia told the district attorney investigator that on January 23, 2013, she was assaulted and robbed of her purse while walking at night on Fairfax Avenue near Beverly Boulevard. She described an attack similar to both the Lo and Bacher robberies. Just after the robbery, Klioutchevskaia described her assailant to the police as a white male in his early 20's, with blond hair, mustache, and beard, wearing a dark cap, dark sweat jacket, and dark shorts. The following month she selected a photograph of Mills from a photographic lineup, and said she believed with about 50 percent certainty that it depicted the assailant. A few months later, Klioutchevskaia selected Mills from a live lineup, stating she believed he was a different person from the suspect in the photograph, and was about 60 percent certain that he was the robber. Klioutchevskaia also told the investigator that about one month before their interview, near Santa Monica Boulevard and Fountain Avenue, she saw a transient sitting on a curb amid a group of transients. She was 90 percent certain that he was the man who had robbed her, and she told the investigator that she believed that her prior identifications were erroneous.

This evidence was offered to show that Karina and Bacher, like Klioutchevskaia, may also have made mistaken identifications, and that the actual perpetrator could still be at large. Defense counsel argued that the testimony would corroborate the defense expert's opinion regarding the effects of unreliable police identification procedures. The trial court denied the motion pursuant to Evidence Code section 352, and made the following findings: Mills's showing of third-party culpability was insufficient, as the

---

[7]     Mills suggests that because prior to trial the prosecution claimed that the facts showed sufficient cross-admissibility to justify consolidation of the three counts, they must be deemed sufficient to establish a modus operandi. Mill's comparison is inapt. The court's assessment of cross-admissibility to evaluate potential prejudice from a joint trial is different from an assessment of the admissibility of evidence under Evidence Code section 352. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220-1221, 1222, fn. 11.) Further, the trial court's discretion in consolidating or severing counts is broader than its discretion in admitting evidence of uncharged offenses under Evidence Code section 1101, subdivision (b). (*People v. Bean, supra*, 46 Cal.3d at pp. 935-936.)

16

offenses were not sufficiently similar; the probative value of Klioutchevskaia's testimony was outweighed by the potential prejudicial effect of distracting the jury from the subsisting charges; and the evidence would require an undue consumption of time. In particular, the court found that admission of the evidence would require evidence of all the facts surrounding the Klioutchevskaia robbery and all her identifications.

Third-party culpability evidence must tend to directly connect the third party to the commission of the charged crimes. (*People v. Suff* (2014) 58 Cal.4th 1013, 1059; *People v. Hall*, *supra*, 41 Cal.3d at p. 832.) "For evidence of an uncharged offense to be admissible to establish the third party's identity as the perpetrator of the charged crimes, ""'"[t]he pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature."'" [Citations.] A large number of common marks may, when viewed in combination, establish the required distinctive pattern. [Citation.]" (*People v. Elliott, supra*, 53 Cal.4th at p. 581; see also *People v. Suff, supra*, at p. 1060.) Thus, Mills was required to connect the transient seen by Klioutchevskaia to the Lo and Bacher robberies by showing that all three robberies shared enough unusual and distinctive common marks to be like a signature. The "common marks must be distinctive rather than ordinary aspects of any such category of crime." (*People v. Bean, supra*, 46 Cal.3d at p. 937.)

Mills suggests that all three victims gave similar descriptions of the robber, and he notes some similar features common to the three robberies: the Klioutchevskaia robbery occurred at night within a few blocks and within three days of the Lo and Bacher robberies; the robber in all cases either knocked the victim down or attempted to do so; Bacher described him as a white male, 5'11, 180 pounds; Karina described a white male, 5'10, 160 pounds, 20 to 30 years of age, with brown hair, wearing a black hooded sweatshirt and black pants; and Klioutchevskaia described a white male in his early 20's, with blond hair, mustache, and beard, wearing a dark cap, dark sweat jacket, dark shorts. Unlike the others, she said that he displayed a gun.

Mills submitted no facts that might show that strong-arm robberies at night in West Hollywood or a nearby Los Angeles neighborhood were unusual, or that particular characteristics of the three robberies were not simply the ordinary aspects of any such

17

crimes. Nor did the descriptions suggest that the commission of such crimes by a white man of average build, in his 20's, wearing dark clothing, and displaying a gun during just one of them, is so unusual and distinctive as to be like a signature. We conclude that the trial court did not abuse its discretion in finding the dismissed crime too dissimilar to the charged crimes to be relevant.

Mills also contends that Klioutchevskaia's testimony would show that Karina and Bacher could have been mistaken in their identifications, because Klioutchevskaia might also have been mistaken in her initial identification. Mills argues that Klioutchevskaia's certainty that it was the transient, not the suspect she identified earlier, would have supported the defense that another man committed the robberies and Mills was misidentified as the perpetrator. He cites the testimony of the defense expert on eyewitness memory that several witnesses can make the same mistaken identification if the police procedures are unreliable and suggestive, and that such witnesses can become more certain as time goes by.

There was no evidence that unreliable identification procedures were used here. Moreover, Dr. Eisen testified that witnesses' memories tended to be more detailed and more accurate immediately after an event, and that details may be lost over time. Klioutchevskaia twice identified Mills soon after the robbery; her identification of the transient came approximately nine months later. This evidence would be more likely to have defeated any third-party culpability defense and bolstered the identifications by Lo and Bacher; it thus had little probative value for the defense, and the trial court did not abuse its discretion in excluding the evidence. For the same reason, there is no reasonable probability that admission of the Klioutchevskaia evidence would have yielded a different result. Mills has not demonstrated a miscarriage of justice.

### III. Instruction as to grand theft

Mills contends that the trial court erred in refusing to give a requested jury instruction on theft as a lesser included offense of robbery. Sherard joins in this contention and adopts Mills's arguments; however, as he has failed to provide a particularized argument in support of his claimed right to relief on this point, we have

18

confined our discussion to Mills's arguments. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363-364.)

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) "The trial court must instruct on general legal principles closely related to the case. This duty extends to necessarily included offenses when the evidence raises a question as to whether all the elements of the charged offense are present. [Citation.] It is settled that the crime of theft, whether divided by degree into grand theft or petty theft, is a lesser included offense of robbery. [Citation.] Robbery includes the added element of force or fear. [Citation.] [¶] Nevertheless, 'the existence of "*any* evidence, no matter how weak," will not justify instructions on a lesser included offense . . . .' [Citation.] Such instructions are required only where there is 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense. [Citations.]" (*People v. DePriest* (2007) 42 Cal.4th 1, 50.) "'We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense. [Citation.]'" (*People v. Licas* (2007) 41 Cal.4th 362, 366.)

Mills contends that the substantial evidence of theft without force or fear was the following: although Hernandez consistently said he was punched at least one time in the face, there were inconsistencies in Hernandez's testimony and his statements to the police about which defendant hit him, how many times he was hit, and whether he was injured; there was no "independent" evidence (such as the surveillance video) showing that Hernandez was hit at all; Mills did not search Hernandez until after Hernandez was leaving; Hernandez did not run, but walked away after he was told to leave; and he waited several hours before calling the police.

Mills cites no authority for his suggestion that viewing the evidence in the light favoring his argument that the instruction should have been given, requires that we disregard the victim's testimony unless it is independently corroborated. Nor does Mills cite authority for the suggestion that no robbery occurs when the force is applied by an

19

accomplice or when there is no injury. Although Mills has identified a few inconsistencies in the evidence, he has identified no evidence to contradict Hernandez's testimony that he was punched in the face soon after he emerged from the liquor store. Indeed, there was circumstantial evidence which corroborated Hernandez's testimony that the punch in his face caused him to move backward. The surveillance video showed Mills approaching Hernandez just before Hernandez claimed to have been punched, and while the punch itself was not captured on camera, Hernandez could be seen backing up immediately afterward.

As Mills points out, it has been said that the quantum force necessary to turn theft into robbery must be something more than that "which is necessary to accomplish the mere seizing of the property." (*People v. Morales* (1975) 49 Cal.App.3d 134, 139.) However, this simply means, for example, that snatching a purse from an unresisting person is not robbery (*People v. Burns* (2009) 172 Cal.App.4th 1251, 1258-1259), or that the incidental touching caused by a pickpocket while extracting a wallet from his victim's pocket does not make the crime a robbery (*People v. Garcia* (1996) 45 Cal.App.4th 1242, 1246, disapproved on another point in *People v. Mosby* (2004) 33 Cal.4th 353, 365, fn. 2). "[F]or purposes of the crime of robbery, the degree of force utilized is immaterial. [Citations.]" (*People v. Griffin* (2004) 33 Cal.4th 1015, 1025.) Even a slight push and tap on the shoulder is sufficient if it overcomes the victim's resistance, such as by causing fear. (*People v. Garcia, supra*, at p. 1246.)

Mills fails to explain how it was necessary to punch Hernandez in the face to seize his wallet and cell phone. Mills fails to explain how a punch in the *face* was merely incidental to grabbing property kept in the victim's *pockets*. The only reasonable inference to be drawn is that Mills intended to overcome Hernandez's resistance by means of fear of bodily injury.

Moreover, Hernandez was in fear of bodily injury. Hernandez testified that when Mills approached him inside the liquor store and asked where he was from, Hernandez felt intimidated, was afraid, and was concerned for his safety. Later, when he was punched, Hernandez thought that defendants would kill him "or something." Not only

20

did Hernandez not resist, he offered to let them take his just-purchased alcohol, as well. The only evidence that Mills cites to suggest that Hernandez was not afraid, that he walked rather than ran home and was reluctant to call the police, may be sufficient to support such a speculation, but "'[s]peculation is an insufficient basis upon which to require the trial court to give an instruction on a lesser included offense.' [Citation.]" (*People v. Sakarias* (2000) 22 Cal.4th 596, 620.)

Mills contends that there was substantial evidence to support a finding that he did not form the intent to steal until after applying force. "'If intent to steal arose only after the victim was assaulted, the robbery element of stealing by force or fear is absent. [Citations.]' (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055-1056 [to constitute robbery, intent to steal must be formed before or during the application of force].) . . . 'Instructions on after-acquired intent and theft as a lesser included offense of robbery are unwarranted absent "substantial evidence" that the defendant first formed the intent to take the victim's property after applying force. [Citation.]' [Citation.]" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1331.) This means that to justify a theft instruction substantial evidence must support an inference that the defendant "formed the intent to steal only after he ceased applying force against the victim." (*Id*. at p. 1332.)

Mills contends that because Hernandez testified that Mills did not search him until Hernandez began walking away, the jury could have found that he did not form the intent to steal until Hernandez was punched. Mills attempts to compare these facts to those in *People v. Ramkeesoon* (1985) 39 Cal.3d 346, 349-351. However, any comparison fails, as the defendant in that case *testified* that he did not form the intent to steal until after he had fatally wounded the victim. Here, there was no testimony from Mills or other evidence to suggest a state of mind other than the intent to assault Hernandez in order to steal from him. Indeed, an attack which overcomes the victim's resistance, followed by theft, gives rise to the reasonable inference that the intent to steal existed at the time of the attack. (See *People v. Holt* (1997) 15 Cal.4th 619, 670-671.) During the 10 seconds after Hernandez was struck, his wallet was demanded and his pockets were searched. The only reasonable inference to be drawn from these facts is that Mills intended to

commit a robbery at the time he or Sherard punched Hernandez. Any after-acquired intent appears to have been merely an intent to check for any missed valuables.

Regardless, the omission of a theft instruction was harmless, as "'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions' [citation]." (*People v. Prettyman* (1996) 14 Cal.4th 248, 276.) The jury was instructed with CALCRIM No. 1600 on the elements of robbery, including the following language:

> "[T]he defendant used [force] or fear to take the property or to prevent the person from resisting; and . . . when the defendant used force or fear to take the property, he intended to deprive the owner of it permanently. The defendant's intent to take the property must have been formed before or during the time that he used force or fear. If the defendant did not form this required intent until after using the force or fear, then he did not commit robbery."

The jury was also amply instructed that it must find the defendant not guilty unless the People met their burden of proof beyond a reasonable doubt. The jury's guilty verdict necessarily included a finding that Mills used force or fear to steal Hernandez's property, and the intent to steal was formed before or during the time he used force or fear. Had the jury not found the elements of force or fear, or if it had found that the intent to steal was formed only as an afterthought, it would have acquitted Mills of the robbery altogether. Under such circumstances, it was not reasonably probable that a theft instruction would have produced more favorable result. (See *People v. Breverman* (1998) 19 Cal.4th 142, 149 [*Watson* test applies to failure to instruct on lesser included offense]; *Watson, supra*, 46 Cal.2d at p. 836.)

## IV. Self-representation motion

Mills contends that the trial court violated his constitutional right to represent himself during sentencing by denying his *Faretta* motion,[8] which he made on February

---

[8] See *Faretta v. California* (1975) 422 U.S. 806, 820-821, 835 (*Faretta*).

22

14, 2014, the date scheduled for his bifurcated court trial on his prior convictions and sentencing.

The Sixth Amendment to the United States Constitution grants criminal defendants the right to counsel in all proceedings that may substantially affect their rights. (*Mempa v. Rhay* (1967) 389 U.S. 128, 133-134.) The right to counsel may be waived if the waiver is knowing and intelligent. (*Faretta, supra*, 422 U.S. at p. 807; *People v. Bradford* (1997) 15 Cal.4th 1229, 1363.) So long as the defendant's request is made knowingly and voluntarily, and asserted within a reasonable time prior to trial, the right of self-representation is absolute. (*People v. Doolin* (2009) 45 Cal.4th 390, 453.) Otherwise, the issue is left to the trial court's discretion. (*People v. Windham* (1977) 19 Cal.3d 121, 127-129 (*Windham*).)

The trial court conducted an ex parte hearing, allowed Mills to explain the basis of his claim, and then heard defense counsel's explanations. The record does not reflect that Mills asked to represent himself during sentencing as he claims on appeal. Instead, Mills sought to represent himself in bringing a motion for new trial on the ground of ineffective assistance of counsel. The court initially granted the motion when Mills said he was prepared to proceed, but Mills changed his position when the court indicated that there would be no continuance. The court then denied the motion as untimely and proceeded to trial on the prior convictions.

Later the same day, after Sherard was sentenced, the court heard further argument from defense counsel regarding Mills's request to represent himself and the need for a continuance. Counsel stated that Mills had informed her on January 15, 2014, that because she did not intend to move for a new trial, he wished to represent himself. She telephoned the court clerk to ask that the case be advanced for an immediate *Faretta* hearing, but the clerk refused, telling her that the court would not like to have the case advanced because there was a codefendant and a scheduled bifurcated trial on the prior convictions. Counsel did not file a written motion to either advance the case or to continue the sentencing hearing, and did not otherwise notify the court in writing of Mills's request to proceed in pro. per. Counsel explained to the court that the clerk's

23

statements led her to believe that the trial court would hear a *Faretta* motion at the time set for the bifurcated trial, and then give Mills time to decide what he wished to do with regard to his sentencing. Despite this additional argument the ruling remained unchanged and the court proceeded with sentencing.

Mills contends that his motion was timely, and thus his right to represent himself was absolute and not a matter of the court's discretion. While Mills recognizes that a motion made after verdicts but before a bifurcated court trial on prior convictions has been held to have been made midtrial and thus untimely (see *People v. Rivers* (1993) 20 Cal.App.4th 1040 (*Rivers*); *People v. Givan* (1992) 4 Cal.App.4th 1107), he points to *People v. Miller* (2007) 153 Cal.App.4th 1015 (*Miller*), where it was held that once a case moves beyond the trial stage and enters posttrial proceedings, a *Faretta* motion may be timely. In *Miller*, the defendant made his motion to represent himself for sentencing after the completion of trial, and two months before sentencing, which the appellate court considered a "separate proceeding[] from the trial." The court held that the request was timely and the right to self-representation was thus absolute. (*Id.* at p. 1024.)

Mills argues that these cases show that a motion for self-representation at sentencing must be made after the bifurcated court trial on prior convictions but prior to sentencing. Mills contends that the holding of *Miller* applies here, requiring that his renewed motion must be deemed timely because he made it as soon after trial and before sentencing as possible. He argues that when both proceedings are scheduled for the same day, as in this case, it would be paradoxical to require the defendant to wait until after the bifurcated trial, only to have the motion deemed untimely because it was not brought well enough in advance of sentencing. He concludes that a *Faretta* motion must therefore be deemed timely under such circumstances, or the constitutional right of self-representation would always be thwarted. We do not read *Miller* as enunciating a bright-line rule of timeliness; nor has the California Supreme Court construed *Miller* as doing so; rather, the high court explained that the circumstances in *Miller* made the *Faretta* motion timely, not simply because a sentencing hearing was a separate, posttrial proceeding, but because it

24

was made within a reasonable time prior to the proceeding in which the defendant sought to represent himself. (See *People v. Doolin, supra*, 45 Cal.4th at p. 455, fn. 39.)

Mills also contends that he should be deemed to have made the motion when he informed defense counsel one month earlier that he wished to represent himself. He compares this circumstance to a constructive filing of a notice of appeal or civil action by an incarcerated defendant who has relied upon trial counsel's representation that the notice of appeal would be timely filed, or upon prison officials to mail the notice. (See *People v. Slobodion* (1947) 30 Cal.2d 362, 365-369; *In re Benoit* (1973) 10 Cal.3d 72, 85-89.) We have no basis to craft such a rule here, where there was no evidence of such reliance. Defense counsel stated to the court that she inquired about setting a hearing on Mills's *Faretta* motion, but there was no mention of any representation made to Mills or his expectation; and Mills did not claim to have attempted to send mail to the court or his attorney.

Regardless, we decline to second-guess the California Supreme Court's consistent refusal to adopt a bright-line test of timeliness for *Faretta* motions. (See *People v. Lynch* (2010) 50 Cal.4th 693, 771, overruled on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 636-643; *People v. Clark* (1992) 3 Cal.4th 41, 99; *People v. Burton* (1989) 48 Cal.3d 843, 854.) "[T]imeliness for purposes of *Faretta* is based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made. An analysis based on these considerations is in accord with the purpose of the timeliness requirement, which is 'to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice.' [Citation.]" (*People v. Lynch, supra*, at p. 724, quoting *People v. Burton, supra*, at p. 852.)

Mills did not seek to represent himself for purposes of sentencing, but to bring a motion for new trial on grounds that all related to the guilt phase of the bifurcated trial. He has cited no authority for his suggestion that he was precluded from making a *Faretta* motion for that purpose prior to the second part of the bifurcated trial on the prior

convictions.[9] The guilt phase of the trial concluded on December 16, 2013. On that date all counsel joined in a request to continue sentencing, and agreed to February 14, 2014. In January, Mills informed counsel that he wished to represent himself. One month after that, two months after his conviction, Mills made his *Faretta* motion. Under all the circumstances, the right to self-representation cannot be deemed timely.

In ruling on an untimely *Faretta* motion, the trial court should consider such factors as "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham, supra*, 19 Cal.3d at p. 128.) "[A] trial court's exercise of discretion in denying an untimely *Faretta* motion is properly affirmed if substantial evidence in the record supports the inference that the court had those factors in mind when it ruled. [Citation.]" (*People v. Bradford* (2010) 187 Cal.App.4th 1345, 1354.) "'[A] reviewing court must give "considerable weight" to the court's exercise of discretion and must examine the total circumstances confronting the court when the decision is made.' [Citation.]" (*Id.* at p. 1353.) A trial court's ruling is an abuse of discretion only when it is so arbitrary, capricious, or absurd as to constitute a miscarriage of justice. (See *People v. Rodrigues, supra*, 8 Cal.4th at pp. 1124-1125 [abuse of discretion standard].) Whether an erroneous denial of an untimely *Faretta* motion resulted in a miscarriage of justice is determined under the harmless error test of *Watson*. (*Rivers, supra*, 20 Cal.App.4th at p. 1050.) Under that test, it is the defendant's burden to establish "a reasonable probability that error affected the trial's result." (*People v. Hernandez* (2011) 51 Cal.4th 733, 746.)

It is apparent from the record that the trial court considered the *Windham* factors. While Mills had shown no proclivity to substitute counsel, substantial evidence supports the court's express and implied findings that defense counsel's representation was

---

[9] Though we have found no case in which such a motion was made, it appears to be permissible. (Cf. *People v. Risenhoover* (1966) 240 Cal.App.2d 233; see 6 Witkin, Cal. Criminal Law (4th ed. 2012) Criminal Judgment, § 126, p. 169.)

adequate and that the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow did not favor granting the motion. (See *Windham*, *supra*, 19 Cal.3d at p. 128.) The court conducted an in camera hearing, and permitted Mills to state the reasons for his dissatisfaction with counsel, as well as the grounds for his proposed new trial motion. Defense counsel responded to the reasons for his dissatisfaction and explained the strategic reasons for not making all motions or calling all witnesses suggested by Mills.

Mills has made no attempt to demonstrate a miscarriage of justice, but merely argues that the *Watson* test is impractical to apply to the denial of requests for self-representation, as it is recognized that in most criminal prosecutions defendants are rarely capable of securing a better result when representing themselves. (See *Faretta, supra*, 422 U.S. at p. 834; *Rivers, supra*, 20 Cal.App.4th at p. 1051.) Mills asks that the matter be remanded for resentencing, but does not suggest that a motion for a new trial might have succeeded if he had been permitted to represent himself in bringing the motion.

Indeed, Mills does not suggest that a motion for new trial might have been granted if brought by an experienced attorney, and we discern no reasonable likelihood of such success. Mills stated several grounds on which he would make a new trial motion: prejudice due to the joinder of counts; the failure of defense counsel to call all witnesses he would have called, to make a *Pitchess* motion,[10] or to call a gang expert; sleeping jurors; the trial court's alleged bias; insufficient evidence of the gang enhancement; and alleged intimidation of a witness by the court, causing the witness to refuse to testify. Mills's counsel responded that her file reflected the decisions she made during trial that she had strategic reasons not to make a *Pitchess* motion, and she had found no basis for one. Counsel also stated that some witnesses were not called for strategic purposes based on inconsistencies in their statements, lack of reliability, or past convictions that might affect credibility. The trial court expressed the view that most of Mills's grounds could be reviewed on appeal. Neither defense counsel nor the court observed any sleeping

---

**10**    See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*); Penal Code sections 832.7 and 832.8; Evidence Code sections 1043 through 1045.

jurors during trial, and the court denied intimidating any witnesses. Under such circumstances, a motion for new trial had no reasonable probability of success, and no prejudice is shown.

## V. Cumulative error

Mills contends that the cumulative effect of all the alleged errors was to deny him a fair trial. Because "[w]e have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial," we must reject Mills's claim of prejudicial cumulative effect. (*People v. Sapp* (2003) 31 Cal.4th 240, 316.)

## VI. Witness intimidation (count 13)

Sherard contends that Hernandez's testimony that Sherard made intimidating gestures when Hernandez took the witness stand did not provide substantial evidence to support his conviction of attempting to dissuade a witness. He contends that the crime cannot be committed with gestures alone, but must include audible words. Further, he contends that the evidence showed only that he moved his hand in a manner that was equally subject to an innocent interpretation.

When a criminal conviction is challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) In making this determination, we do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*Ibid*.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Sherard was convicted of a felony violation of section 136.1, subdivisions (a)(2) and (c)(1): a knowing and malicious attempt to prevent or dissuade a witness from attending or giving testimony, when such act is accompanied by force or by an express or implied threat of force or violence. Attempting to dissuade a witness from testifying is a specific intent crime. (*People v. Young, supra*, 34 Cal.4th at p. 1210.) Thus, the defendant must intend his acts or statements to affect or influence the testimony or acts of a potential witness. (*People v. McDaniel* (1994) 22 Cal.App.4th 278, 284.) "There is, of course, no talismanic requirement that a defendant must say 'Don't testify' or words tantamount thereto, in order to commit the charged offenses." (*People v. Thomas* (1978) 83 Cal.App.3d 511, 514.) Even ambiguous statements are sufficient to support a conviction where a jury could reasonably interpret them under the circumstances as a warning or threat not to testify. (*People v. Ford* (1983) 145 Cal.App.3d 985, 989-990.) The defendant's intent to dissuade a witness may be inferred from his words or actions. (See *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1343; *People v. Thomas, supra*, at p. 514.)

Here, Hernandez demonstrated Sherard's gestures as a fist raised upward over his chest, followed by a forward pointed index finger, and then another closed fist, which Sherard moved back and forth a number of times. As Sherard made these gestures, he looked directly at Hernandez and inaudibly mouthed, "I'm gonna fuck you up." On cross-examination, Hernandez agreed that because he did not hear the words, he could not be certain what is was that Sherard mouthed. Hernandez nevertheless felt threatened and frightened.

Sherard contends that a violation of section 136.1 cannot be based upon mere hand gestures or the inaudible formation of words. He cites no authority for his assertion, but argues that his position is supported by "pure logic," because gestures, especially gestures by a defendant who is naturally unhappy to be in court, are particularly susceptible to speculative interpretation.

First, we reject any suggestion that if Sherard's gestures were equally susceptible to an innocent interpretation, this court must accept that interpretation. This describes the

29

jury's duty, and is inapplicable on appeal. (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.) "'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]' [Citation.]" (*Id.* at p. 793.)

Further, there is no provision in section 136.1 requiring a verbal or audible expression. Sherard was not charged with the related crime of making a criminal threat in violation of section 422, subdivision (a), for example, which expressly requires a verbal, written, or electronic communication. (§ 422, subd. (a); see *People v. Franz* (2001) 88 Cal.App.4th 1426, 1442, 1448 ["verbal" means any noise or sound capable of conveying some meaning].) By contrast, "[t]he language of section 136.1 focuses on an unlawful goal or effect, the prevention of testimony, rather than on any particular action taken to produce that end." (*People v. Salvato* (1991) 234 Cal.App.3d 872, 883.)

Like Sherard, neither we nor respondent has found a California case which directly addresses whether threatening gestures alone can or cannot constitute an attempt to dissuade a witness. In jurisdictions which also require proof of an express or implied threat against the witness, evidence of threatening gestures alone have been held sufficient. (See, e.g., *United States v. Balzano* (7th Cir. 1990) 916 F.2d 1273, 1279, 1291 [throat-slashing and gun-simulating gestures constituted violation of 18 U.S.C. § 1512(b)]; *State v. Quinones* (2009) 42 Kan.App.2d 48, 53-55 [throat-slicing gestures during witness's testimony].) Thus, unless an express verbalization is required by the statute, "someone may intimidate a witness by glaring at him, drawing his hand across his throat, and making a motion with his fingers of shooting him, without saying a word." (*United States v. Navarro* (9th Cir. 2010) 608 F.3d 529, 534, fn. omitted.) Similarly here, a jury could reasonably find that Sherard's gestures were intended to imply a threat of violence against Hernandez if he testified, particularly as they were made while Sherard was staring and pointing at Hernandez as he mouthed what appeared to be threatening words.

30

We also reject Sherard's suggestion that we must consider the bailiff's failure to observe the gestures in reviewing the sufficiency of the evidence; and the contention that Hernandez necessarily "recanted" his testimony that threatening words were mouthed, that respondent conceded as much, or that such testimony may not be considered on appeal.[11] The uncorroborated testimony of a single witness is sufficient to sustain a conviction unless the testimony is physically impossible or inherently improbable. (*People v. Scott* (1978) 21 Cal.3d 284, 296.) Inconsistencies within the testimony do not render the evidence insufficient, as it is the exclusive province of the jury to determine the credibility of a witness and to resolve evidentiary conflicts. (*People v. Young, supra*, 34 Cal.4th at p. 1181.) Indeed, "a trier of fact is permitted to credit some portions of a witness's testimony, and not credit others." (*People v. Williams* (1992) 4 Cal.4th 354, 364.)

Sherard has failed to demonstrate that it was physically impossible or inherently improbable that the gestures were as Hernandez described them or that he incorrectly interpreted the mouthed words. We conclude that Hernandez's testimony provided substantial evidence to support the jury's finding that the gestures were meant as an implied threat.

## VII. 911 call

Sherard contends that count 1 must be reversed because Hernandez's 911 call was inadmissible hearsay and should have been excluded in its entirety. Mills joins in this contention and adopts Sherard's arguments; however, as he has failed to provide a particularized argument in support of his claimed right to relief on this point, we have confined our discussion to Sherard's arguments. (See *People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at pp. 363-364.)

---

[11] After Hernandez agreed that he could not be certain of the words mouthed, because they were not audible, defense counsel asked, "So whatever threat you say happened now is limited solely to a physical motion; am I right?" Hernandez answered, "Yeah." Counsel followed up with the question, "Can we disregard any words he may have mouthed now?" The trial court sustained an objection to the last question, adding, "It's up to the jury to decide what they will consider."

31

Sherard claims to have objected to the admission of the 911 call. In fact, his counsel objected to the following four lines in the 12-page transcript of Hernandez's call to the 911 operator: "And then the guy told me, the, the owner of the liquor store told me, why this guy asking you where you from? And I said I don't know he's crazy." Respondent contends that except as to this portion of the call, Sherard's contention is forfeited on appeal.

We agree. A challenge to the admissibility of evidence is generally not cognizable on appeal in the absence of a specific and timely objection in the trial court on the ground urged on appeal. (Evid. Code, § 353.) An objection on one ground does not preserve a challenge based upon a different ground. (*People v. Partida* (2005) 37 Cal.4th 428, 434-435.) "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Id*. at p. 435.) And as Sherard does not direct any argument to the portion of the 911 call which was the subject of his trial objection, we need not consider whether the trial court erred in its admission. (See *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2.)

Apparently anticipating this finding, Sherard has asked in a footnote that we nevertheless reach his contention in order to forestall a claim of ineffective assistance of counsel. We decline, as it does not appear that Sherard would be able to sustain such a claim by demonstrating that a more favorable outcome was reasonably probable in the absence of counsel's alleged errors. (See *Strickland v. Washington* (1984) 466 U.S. 668, 694, 697; *People v. Rodrigues, supra*, 8 Cal.4th at p. 1126.)

Sherard contends that the 911 call was prejudicial because it buttressed conflicting parts of Hernandez's testimony regarding the actions of Mills during the robbery. Sherard fails to specify what part of the testimony about Mills's actions was harmful or helpful, or how it was harmful or helpful, but simply claims it was "fully detailed in the statement of facts." Sherard also contends that he was prejudiced by Hernandez's opinions given to the 911 operator that both robbers were gang members, and that one of them might have had a weapon; and he complains that such statements buttressed Hernandez's testimony and the evidence that defendants were gang members. The

32

challenged statements were merely somewhat duplicative of Hernandez's trial testimony and the gang expert's testimony, which did not need corroboration. The exclusion of Hernandez's opinion that defendants were gang members could not have affected the result, as there was ample evidence given by gang expert Officer O'Brien, who testified that Mills had admitted his membership in the School Yard Crip gang, and that Sherard had admitted to other officers that he was an active member in the gang.

Nor was it probable that the verdict was affected by Hernandez's statement to the 911 operator that he did not observe a weapon. Hernandez testified that there was something under Mills's shirt that he thought was a gun. His 911 statement suggests that there was, in fact, no gun, and as respondent notes, such a suggestion was favorable to Sherard, not harmful.

As Sherard has not demonstrated that the admission of the 911 call resulted in a miscarriage of justice, this conclusion would dispose of any ineffective assistance claim, obviating any need to reach Sherard's forfeited hearsay contention to forestall a claim of ineffective assistance of counsel.

Regardless, if we were to reach the merits of the issue and find the 911 call to be inadmissible hearsay, we would conclude that the admission of this evidence was harmless. The erroneous admission of evidence is not reversible unless it has resulted in a miscarriage of justice, measured under the test of *Watson*, *supra*, 46 Cal.2d at p. 836. (*People v. Partida*, *supra*, 37 Cal.4th at p. 439; see Evid. Code, § 353; Cal. Const., art. VI, § 13.) A miscarriage of justice occurs when it appears that a result more favorable to the appealing party would have been reached in the absence of the alleged errors. (*Watson*, at p. 836; see Cal. Const., art. VI, § 13.) It is Sherard's burden to demonstrate prejudice. (See *People v. Hernandez* (2011) 51 Cal.4th 733, 746.)

There is no merit to Sherard's conclusion that the evidence as to count 1 was "far from overwhelming." Hernandez positively identified Sherard at trial as one of the robbers, and video surveillance corroborated Hernandez's testimony by showing Mills approach Hernandez in the store, and then showing Hernandez, Mills, and Sherard outside the store. We discern no reasonable probability that the exclusion of the 911 call

would have raised a reasonable doubt in the minds of the jurors regarding the identity of the robbers, their gang affiliation, or the defendants' guilt.

## DISPOSITION

The judgments are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
HOFFSTADT